ORIGINAL

FILED
JAN 2 9 2004
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAI**

| | | |
|---|---|---|
| **NIAGARA MOHAWK POWER CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | |
| | | **04-0124C** |
| **THE UNITED STATES OF AMERICA,** | | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**COMPLAINT**

For its Complaint against the Defendant United States of America (the "Government"), Plaintiff Niagara Mohawk Power Corporation ("Niagara Mohawk" or "Plaintiff"), by counsel, states as follows:

**SUMMARY OF PLAINTIFF'S CLAIMS**

1. This action arises from the Government's failure to dispose of spent nuclear fuel and/or high-level radioactive waste ("SNF") stored at Unit 1 of the Nine Mile Point Nuclear Power Plant (the "Nine Mile Point Unit 1") located in Oswego County, New York, that was owned and operated by Plaintiff under a license from the Nuclear Regulatory Commission ("NRC"). SNF is used nuclear fuel from a reactor and contains highly radioactive fission products. SNF remains highly radioactive and must be isolated in safe disposal facilities for thousands of years.

2. This action is based upon the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq*. ("NWPA"), the Government's course of dealing with civilian nuclear power over a period of decades.

3. Pursuant to the NWPA, the Government entered into a standard contract with all operators of nuclear plants. The Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, (the "Contract") (Contract No. DE-CR01-83NE44398) was executed by and between the Government and Niagara Mohawk.

4. Plaintiff paid substantial SNF disposal fees in compliance with their obligations under the NWPA.

5. On September 28, 2000, the Plaintiff issued an offering memorandum soliciting competitive bids for the acquisition of their ownership interests in the Nine Mile Point Unit 1. The offering memorandum also included the interests of the Plaintiff, New York State Electric & Gas Corporation, Rochester Gas and Electric Corporation, and Central Hudson Gas & Electric Corporation in Nine Mile Point Unit 2. Following the receipt of bids and subsequent negotiations with bidders, on December 11, 2000, Plaintiff entered into an Asset Purchase Agreement ("APA") with Constellation Energy Group and Constellation Nuclear, LLC (together with Nine Mile Point Nuclear Station LLC ("NMPNS"), collectively, "CEG") for the sale of its 100% ownership interest in Nine Mile Point Unit 1 and related assets, among other things. On November 7, 2001, the sale was completed pursuant to the APA, thus transferring to CEG Plaintiff's 100% ownership interest Nine Mile Point Unit 1, including all future obligations to store and dispose of SNF related to the transferred ownership interests. Effective as of the date of the closing, an Assignment and Assumption Agreement was executed between Plaintiff and CEG , to further effectuate the transfer of assets under the APA.

6. The Government failed to perform its obligation to dispose of the SNF from Nine Mile Point Unit 1 beginning not later than January 31, 1998, including a failure to commence disposal

on or before January 31, 1998, which continued up to the date of sale. In addition, the Government announced that it would not begin disposing of the SNF before 2010, at the earliest. Upon information and belief, the Government's past and on-going failure to comply with its obligations to dispose of the SNF from Nine Mile Point Unit 1 were known to all bidders in the auction process commenced on September 28, 2000. The Government's failure to perform its obligations to dispose of SNF and announced policy to continue collecting waste disposal fees while continuing to default on its obligation to dispose of SNF, forced Plaintiff to undertake additional actions including planning for storage of SNF on its real property and reracking the spent fuel pool, caused Plaintiff to satisfy increased decommissioning funding requirements, and diminished the value of Nine Mile Point Unit 1 up to and on the date of sale, and thereby constitute a taking of Plaintiff's property rights without just compensation.

7. Even though Plaintiff paid all required fees pursuant to the NWPA, the Government failed to perform its obligations.

8. The Government's repeated breaches of its statutory obligations diminished the value of Nine Mile Point Unit 2 and such diminished value was reflected in the sales price of Nine Mile Point Unit 2.

## STATEMENT OF JURISDICTION

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

10. Plaintiff is a corporation organized and incorporated under the laws of the State of New York. Prior to November 7, 2001, Plaintiff was the licensed operator and sole owner Nine Mile Point Unit 1.

11. Defendant is the United States of America (the "Government"), acting through the United States Department of Energy ("DOE").

## STATEMENT OF FACTS

12. Since the time of President Eisenhower's "Atoms for Peace" initiative in 1953, the Government has encouraged and promoted the commercial development of atomic energy in the United States. Nine Mile Point Unit 2 was developed and operated pursuant to licenses issued by the NRC pursuant to the Atomic Energy Act, as amended, 42 U.S.C. § 2011 *et seq.*, consistent with the Government's stated policy to encourage private participation in the development and demonstration of economically-feasible and safe nuclear power generation.C

13. In 1982, Congress enacted the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* ("NWPA"). The NWPA codified the Government's long-standing commitment to accept responsibility for disposal of SNF.

14. Pursuant to Section 302(a) of the NWPA (42 U.S.C. § 10222(a)), DOE developed a standard contract, which incorporates a reciprocal obligation on the part of the Government, acting through DOE, to accept and dispose of the SNF of commercial utilities beginning not later than January 31, 1998, in exchange for the payment of fees by such utilities into the Nuclear Waste Fund (the "Fund"). Specifically, the standard contract promulgated by DOE stated that "[t]he services to be provided by DOE under this contract shall begin . . . not later than January

31, 1998 and shall continue until such time as all SNF . . . has been disposed of." Standard Contact, Art. II.

15. The Contract was executed between the Government and Niagara Mohawk in June 1983.

16. As the owner of Nine Mile Point Unit 1, Niagara Mohawk was the intended beneficiary of and relied upon the NWPA. Congress made clear in the NWPA its intent that all the "owners" of a nuclear plant were to pay for the disposal of SNF and that in return for these fees, the disposal of SNF would be the responsibility of the Federal Government. The NWPA provides in pertinent part:

> (a) The Congress finds that--
>
> . . .
>
> (3) Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate;
>
> (4) while the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and <u>owners</u> of such waste and spent fuel;
>
> (5) the generators and <u>owners</u> of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter;
>
> . . .
>
> (b) The purposes of this part are--
>
> (1) to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;

> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;
>
> . . .
>
> (4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

42 U.S.C.A. § 101031 (1995) (emphases added).

17. Pursuant to the NWPA, DOE was obligated to commence disposal of SNF from Nine Mile Point Unit 1 site not later than January 31, 1998, and to continue to dispose of such SNF until such time as all SNF at Nine Mile Point Unit 1 was disposed of. The NWPA also required DOE to arrange and provide for the transportation of the SNF from the plant site to a DOE disposal facility.

18. Under the NWPA, Plaintiff paid fees into the Fund at the rate of 1 mil per kilowatt hour for all of the electricity produced by Nine Mile Point Unit 1, in return for which DOE would dispose of all of the SNF from Nine Mile Point Unit 1.

19. Plaintiff fully complied with all of their obligations under the NWPA, including the payment of all required fees into the Fund up to the closing date of the sale of Nine Mile Point Unit 1.

20. Pursuant to the NWPA, these fee payments were to be used by DOE to fulfill its obligation to dispose of SNF from Nine Mile Point Unit 1 beginning not later than January 31, 1998.

21. As it became apparent to DOE that it was not going to meet its statutory obligations, DOE forecasted an increasingly restrictive annual SNF acceptance rate, as well as increasingly

elongated and artificial schedules for disposal. At the same time, however, DOE continued to make assurances that it would begin to dispose of the SNF by the 1998 deadline in keeping with its statutory obligations.

22. Congress substantially amended the NWPA in 1987 to require DOE to focus its repository development effort on assessing the suitability of and characterizing Yucca Mountain, Nevada as the site for the permanent geologic repository.

23. On April 28, 1995, DOE issued a "Final Interpretation of Nuclear Waste Acceptance Issues," 60 Fed. Reg. 21,793 (1995) ("Final Interpretation"), announcing that it had "become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998," and asserting that the Government did not have any obligation to dispose of SNF pending the completion of construction and licensing by DOE of a geologic repository. DOE further asserted that it was not authorized to accept, store, or dispose of SNF absent the existence of an operational permanent repository. This position contradicted earlier acknowledgements by DOE that the Government had an unconditional obligation to remove SNF from plant sites beginning no later than January 31, 1998.

24. A large number of nuclear utilities sought review of DOE's "Final Interpretation" in the United States Court of Appeals for the District of Columbia Circuit pursuant to Section 119 of the NWPA (42 U.S.C. § 10139). The court rejected the interpretation of the NWPA set forth in DOE's Final Interpretation, holding that DOE had an "unconditional" obligation to begin disposing of the utilities' SNF by January 31, 1998, which was reciprocal to the utilities' obligation to pay fees. *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996).

25. Notwithstanding the D.C. Circuit's ruling, in a December 17, 1996, letter to the utilities, DOE announced that "DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998," and in a June 3, 1997, response to comments by the utilities, DOE asserted that its failure to meet the deadline was excused under Article IX, DELAYS, of the utilities' standard contracts because its delay was, it asserted, unavoidable.

26. In response, a group of utilities filed another petition with the D.C. Circuit for a writ of mandamus to compel the Government to comply with the court's mandate in *Indiana Michigan*. The D.C. Circuit again ruled in favor of the utilities, reiterating that the Government had an unconditional obligation to begin disposing of the utilities' SNF by January 31, 1998, and issued a writ of mandamus prohibiting the Government from characterizing its failure to accept and dispose of SNF as an unavoidable delay in any proceeding involving standard contracts. *Northern States Power Co. v. United States*, 128 F.3d 754 (D.C. Cir. 1997), *cert. denied*, 525 U.S. 1016 (1998).

27. Despite the court's rulings, the DOE contracting officer with responsibility for the Contract issued a Preliminary Determination, dated June 3, 1997, stating that DOE would not commence disposal operations at the repository before 2010, at the earliest.

28. DOE failed to meet the January 31, 1998, deadline for commencing the disposal of SNF from Nine Mile Point Unit 1, failed to begin disposing of SNF prior to the closing date of the sale of Nine Mile Point Unit 1, and projected that it would continue to fail to fulfill its obligations to dispose of SNF thereafter, and therefore, the Government defaulted on its statutory obligations. Moreover, DOE failed to provide any reasonable assurance as to its schedule for the

disposal of SNF from Nine Mile Point Unit 1. The Government's failure to fulfill its obligations left Plaintiff with no effective means of off-site SNF storage.

29. In *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000), several utilities sued the Government for damages incurred as a proximate result of the Government's failure to perform its obligations. The United States Court of Appeals for the Federal Circuit held that the utilities were not required to pursue administrative remedies for the Government's failure to perform, that the utilities could assert traditional claims (*e.g.*, breach of contract, breach of good faith and fair dealing, taking) in court.

30. In order for a nuclear plant to operate, it must have sufficient space in its spent fuel pool to hold SNF discharged from the reactor during refueling, or during other instances when the reactor must be unloaded. As a result of DOE's defaults on its statutory obligations, and the finite amount of space in the spent fuel pool at Nine Mile Point Unit 1 would have been exhausted but for Plaintiff's reracking, and even after such reracking, there was a finite amount of space in the pool and thus, DOE's defaults have diminished the value of the plant.

31. In response to governmental restructuring initiatives for the electric industry, Plaintiff offered its ownership interests in Nine Mile Point Unit 1 for sale.

32. After extensive due diligence and a competitive auction process, CEG was selected as the winning bidder, and on December 11, 2000, Plaintiff and CEG entered into the APA, contemplating Plaintiff's sale of their ownership interests in Nine Point Unit 1 to CEG. The sale closed on November 7, 2001, along with the sale of Nine Mile Point Unit 2, which was owned by Niagara Mohawk, New York State Electric & Gas Corporation, Rochester Gas and Electric Corporation, and Central Hudson Gas & Electric Corporation. The Long Island Lighting

Company, which was acquired by the Long Island Power Authority and presently is doing business as Long Island Lighting Company d/b/a LIPA, however, retained its ownership interest in Nine Mile Point Unit 2.

33. On information and belief, the number of generation companies willing to participate in the nuclear generation business, the quantity of bids submitted, and the offering price in the bids for Nine Mile Point Unit 1, were depressed as a result of the perception by the potential buyers that DOE's on-going failure to remove and dispose of SNF increased the future costs to operate and risks of ownership of nuclear power-plants, and decreased the amount that the buyers were prepared to offer to purchase the nuclear power-plant assets. The failure of DOE to remove and dispose of SNF also caused the potential buyers to anticipate higher costs for decommissioning of the assets.

34. In order to effectuate the transfer of the operating licenses for Nine Mile Point Unit 1 as required by the APA and NRC licensing requirements, on February 1, 2001, Plaintiff and CEG jointly filed an application with the NRC seeking its approval for the license transfer. NRC approved the license transfer application by order dated October 30, 2001.

35. The sale of the plant did not deprive the Plaintiff of the right to bring claims against DOE related to the taking of property rights up to and including the closing date of the sale.

## STATEMENT OF DAMAGES

36. DOE's failure to commence disposal of SNF on January 31, 1998 as required by the NWPA and its public pronouncement that it would not commence the disposal of SNF until 2010, at the earliest, significantly diminished the value of Nine Mile Point Unit 1. When the Plaintiff sold Nine Mile Point Unit 1, this diminished value was reflected in the auction process,

and ultimately in the sale price of sale for an otherwise extremely valuable nuclear electric generating facility. DOE's failure to timely and completely fulfill its mandates under NWPA directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric generating facilities such as Nine Mile Point Unit 1, to adjust their respective valuations of the facility by decreasing the amount such prospective purchasers were willing to bid for the facility.

37. As a direct result of the Government's on-going default on its obligations under the NWPA, Plaintiff incurred costs associated with the management and storage of SNF which should have been disposed of by DOE. The damages caused by the Government in connection with Nine Mile Point 1 include, but are not limited to, costs associated with planning related to the operation and maintenance of facilities and equipment necessary to store SNF at Nine Mile Point Unit 1, and other administrative and programmatic costs arising directly from the failure of the Government to dispose of SNF from Nine Mile Point Unit 1.

38. As a direct and proximate result of DOE's failure to perform its statutory obligations, Plaintiff suffered significant damages. These damages include significant diminution in the market value for Nine Mile Point Unit 1 which caused Plaintiff to realize significantly less value as a result of the sale of its 100% ownership interest in Nine Mile Point Unit 1 than would have been the case had DOE met its obligations under the NWPA.

39. Had DOE been fulfilling its SNF obligations, Plaintiff would have received the benefits of a more competitive sales process, and the perceived future economic benefits of Nine Mile Point Unit 1 as a source of electric sales revenues would have been significantly greater and more assured. However, DOE's failure to perform resulted in Plaintiff receiving less value for

Nine Mile Point Unit 1 than it would and should have received had DOE fulfilled its statutory obligations.

40. DOE's failure to meet its obligations under NWPA diminished the market value of Nine Mile Point Unit 1 because the remaining useful economic life of the facility was highly uncertain. Absent a place to store the SNF or confidence DOE would fulfill its statutory obligations at any particular time, if ever, the continued operation of the plant for any significant period would be uncertain, if not impossible. As a result, the value of the plant was substantially depressed, because the time period for future electric sales revenues was uncertain. Further, the level of profitability because of increased costs would be depressed. The value of the plant was also diminished because the re-use of the site will be deferred indefinitely until decommissioning and SNF removal are complete. Prospective purchasers of Nine Mile Point Unit 1 reflected this limitation of prospects for assured future operation and re-use in their value assessments.

41. After DOE failed to initiate disposal of SNF on January 31, 1998, and as a result of DOE's failure, the need to construct and then operate for an indefinite period costly on-site storage facilities as a pre-condition to continued commercial operation was immediately apparent.

42. The Government's breach of its statutory duties results in a situation in which owners of SNF, such as Plaintiff, have been forced to pay more than once for SNF storage. Plaintiff was required to pay fees to the Government to dispose of the SNF, and, at the same time, pay for on-site storage of SNF that would not have been necessary had the Government fulfilled its obligations. This double payment diminished the value of Nine Mile Point 1 and was reflected

in a reduced sales price. Sellers of plants were also forced to pay a third time, through the receipt of lower sales prices than otherwise would have been available.

43. Morever, obtaining NRC approval of the license transfer for Nine Mile Point Unit 1 was an essential and critical element of the sales transaction between Plaintiff and CEG. An integral element of obtaining and maintaining an NRC license for a nuclear power plant, such as Nine Mile Point Unit 1, is the obligation of the license holder to provide sufficient funds to cover the full costs of decommissioning the licensed facilities in accordance with NRC requirements, including the management and subsequent removal of all SNF from the site. The total of such costs was significantly greater than would otherwise have been the case due to DOE's failure to perform its obligations under NWPA.

## COUNT ONE

### Taking Without Just Compensation

44. Plaintiff realleges and incorporates by reference Paragraphs 1-43 above.

45. DOE's failure to dispose of the SNF in accordance with its contractual obligations forced Plaintiff to store the SNF on its own real property at Nine Mile Point Unit 1, thereby depriving Plaintiff of the full economic value of its property.

46. DOE's failure to commence and continue disposal of SNF and its announced policy to continue accepting waste disposal fees without providing SNF disposal services, which have been extraordinary and unnecessary, deprived Plaintiff of its real property rights: (i) by compelling Plaintiff to use its real property for extended storage of SNF that the Government was obligated to accept for disposal; (ii) by severely diminishing the value of Nine Mile Point Unit 1 up to and on the date of sale; and (iii) by additional means.

47. By reason of the foregoing, the Government's failures and refusals effectuate a taking of Plaintiff's real property rights, for which the Government is liable for just compensation to Plaintiff.

48. In the alternative, Plaintiff was intended beneficiary of the NWPA and the Contract at all relevant times prior to and including January 31, 1998. Under the NWPA and the Contract, DOE was obligated to accept and/or dispose of Nine Mile Point Unit 1's SNF. Accordingly, as an intended beneficiary of the NWPA and the Contract, Plaintiff possessed property rights to have DOE dispose of Nine Mile Point Unit 1's SNF in a manner and at a cost consistent with the NWPA and the Contract. DOE's failure to commence the disposal program by January 31, 1998, deprived Plaintiff of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary expenses and diminished the value of these facilities. This failure constitutes a taking of Plaintiff's vested property rights without just compensation.

49. DOE's failure to abide by its obligation with respect to SNF has destroyed Plaintiff's reasonable investment-backed expectations arising from the NWPA. DOE's conduct has deprived Plaintiff of the full economic use of its nuclear facilities and related property, and reduced the tangible and intangible value of Nine Mile Point Unit 1 as a going concern.

50. DOE's failure to perform its obligations diminished the value of Plaintiff's property and thus constituted a taking without just compensation. DOE was obligated to undertake the exercise of proper procedures to ensure due process and the calculation of just compensation from the date of taking. DOE failed to exercise those procedures and failed to provide just compensation.

51. By reason of the foregoing, DOE has taken Plaintiff's property in violation of the Fifth Amendment to the Constitution of the United States and is liable to Plaintiff for just compensation.

**PRAYER FOR RELIEF**

52. Based upon the foregoing, and expressly reserving all rights to assert additional and separate claims for presently unascertainable damages as they arise, Plaintiff hereby respectfully requests that judgment be entered in its favor as follows: That the Court grant judgment on Count One in Plaintiff's favor in an amount to be determined in a future proceeding or at trial plus interest, and for such court costs, litigation expenses, and attorneys' fees as are available under applicable law, and for such other compensatory relief as this Court may deem necessary and proper.

Respectfully submitted,

Dated: January 29, 2004

M. Stanford Blanton by Warren Belmar
WARREN BELMAR

M. Stanford Blanton
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

COUNSEL OF RECORD FOR PLAINTIFF,
NIAGARA MOHAWK POWER CORPORATION

Of Counsel:

Ed R. Haden
K.C. Hairston
Warren Belmar
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Phone: (205) 251-8100
Fax: (205) 226-8798