# ATTACHMENT 1

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN 22 2004
U.S. COURT OF FEDERAL CLAIMS

CONSTELLATION GENERATION GROUP, LLC

CALVERT CLIFFS NUCLEAR POWER PLANT, INC.,

NINE MILE POINT NUCLEAR STATION, LLC,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. 04-0068C

Judge: __________

## COMPLAINT

Plaintiffs, Constellation Generation Group, LLC ("CGG"), Calvert Cliffs Nuclear Power Plant, Inc. ("CCNPP") and Nine Mile Point Nuclear Station, LLC ("NMPNS") (collectively for these purposes "Plaintiffs") file this Complaint against the Defendant, the United States of America, acting through the United States Department of Energy ("DOE"), and state as follows:

## NATURE OF THE CASE

1. This is an action for breach of contract and taking of property without just compensation. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), the DOE entered into written contracts, known as the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Waste (the "Contracts" or "Standard Contracts"), with the operators of the Calvert Cliffs Nuclear

Power Plant ("Calvert Cliffs"), Units 1 and 2, and the Nine Mile Point Nuclear Power Plant ("NMP"), Unit 1, in June 1983, and the Nine Mile Point Nuclear Power Plant, Unit 2, in August 1985. Pursuant to the terms of the Standard Contracts, the Government was to accept and dispose of spent nuclear fuel and high level waste (collectively for these purposes, "SNF") generated by the four commercial nuclear power plants on or before January 31, 1998, in exchange for payments as provided in the Standard Contracts. Plaintiffs have honored all of their contractual obligations under the Standard Contracts. The Government breached the Standard Contracts by failing to accept SNF for disposal as required.

## JURISDICTION

2. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1491(a)(1). This action is brought by Plaintiffs within six years of the date of the breach, in accordance with 28 U.S.C. § 2501.

3. Plaintiffs may seek damages without exhausting any administrative remedies because DOE's complete failure to begin acceptance and disposal of Plaintiffs' SNF is a partial material breach of the Standard Contract, and the claim does not "arise under" the Standard Contract. *Maine Yankee Atomic Power Co. v. U. S.*, 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. U. S.*, 224 F.3d 1361 (Fed. Cir. 2000).

4. Furthermore, Article XI of the Standard Contract states, "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, Plaintiffs are entitled to pursue their legal claims without exhausting any administrative remedies.

**PARTIES**

5. CGG is a Maryland corporation and a parent company of CCNPP and NMPNS, the holders of the Standard Contracts at issue here.

6. CCNPP is the full owner and operator of Calvert Cliffs and the holder of the Standard Contract for Calvert Cliffs. CCNPP is a direct subsidiary of CGG. At the time the parties signed the Standard Contract for Calvert Cliffs, Baltimore Gas and Electric Company was the owner and operator of Calvert Cliffs. Through a corporate realignment, operational responsibility and ownership interest in Calvert Cliffs was transferred to CCNPP. By letter dated August 21, 2000 and in accordance with Article XIV of the Standard Contract, the DOE was notified of the assignment of the Standard Contract for Calvert Cliffs to CCNPP.

7. NMPNS is the full owner and operator of NMP, Unit 1, and the majority owner and operator of NMP, Unit 2, and the holder of the two Standard Contracts for NMP, Units 1 and 2. NMPNS is an indirect subsidiary of CGG. At the time the parties signed the Standard Contracts, Niagara Mohawk Power Corporation was the majority owner and operator of NMP. On or about November 7, 2001, NMPNS completed the purchase of NMP (full ownership interest in Unit 1 and majority ownership interest in Unit 2) from Niagara Mohawk Power Corporation. By letter dated October 12, 2001 and in accordance with Article XIV of the Standard Contract, the DOE was notified of assignment of the Standard Contract for NMP to NMPNS. A minority ownership interest

in NMP, Unit 2, is held by the Long Island Power Authority, upon whose behalf NMPNS is authorized to act for these purposes.

8. Defendant is the United States of America, acting by and through the DOE. (Defendant may be referred to interchangeably in this Complaint as the United States, DOE, or the Government.)

## STATEMENT OF FACTS

9. Since enactment of the Atomic Energy Act of 1954, the Government has encouraged the development of commercial reactor technology in the United States. The Calvert Cliffs and NMP commercial reactors were developed and operated pursuant to licenses issued by the Atomic Energy Commission and the Nuclear Regulatory Commission ("NRC").

10. SNF was and continues to be generated at Calvert Cliffs and NMP as a byproduct of the operation of those reactors, and remains stored there now. SNF is composed, in significant part, of uranium and plutonium and other highly radioactive substances. SNF remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for an indefinite period.

### The Government's Obligations Under the Standard Contract

11. In 1982, Congress enacted the NWPA, codifying and confirming the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of civilian SNF. *See* 42 U.S.C. § 10101 *et. seq.* The NWPA provides that the generators and owners of SNF have the primary responsibility to provide for "the interim storage of such waste and spent fuel until such waste and spent

fuel is accepted by [DOE] in accordance with the provisions of this Act." 42 U.S.C. § 10131(a)(5).

12. Pursuant to Section 302 of the NWPA (42 U.S.C. § 10222), the Government in 1983 developed the Standard Contract. The Standard Contract prescribes the payment of certain fees into the Nuclear Waste Fund based on specified criteria, primarily megawatts-electric ("MWe") generated, and the acceptance and disposition of SNF by the Government. *See* 10 C.F.R. § 961.11. Reactor operators were required to enter into these Contracts or risk losing their NRC operating licenses.

13. The DOE entered into the Standard Contracts at issue here for Calvert Cliffs and NMP, Unit 1, in 1983 and NMP, Unit 2, in 1985.

14. Article IV of the Standard Contract sets out the Responsibilities of the Parties. Section A of Article IV establishes the Purchaser's Responsibilities, including payment of certain fees.

15. CGG, CCNPP, and NMPNS, and their predecessors, have fully complied with all of their obligations under the Standard Contracts, including the payment of required fees.

16. The Standard Contracts for Calvert Cliffs and NMP obligate the Government to commence acceptance and disposal of SNF by January 31, 1998 in accordance with the priority established by DOE. *E.g.*, Standard Contract Art. II, Art. IV.B.5(a).

17. The Standard Contract provided that the DOE was to begin accepting SNF no later than January 31, 1998 and to continue "until such time as all SNF and/or HLW

[high level radioactive waste] from the civilian nuclear power reactors ... has been disposed of." Standard Contract, Art. II.

**DOE's Partial Material Breach of the Standard Contract**

18. An important element of the NWPA was the initial development of waste disposal facilities according to a firm and fixed schedule. DOE quickly fell behind that schedule, failing to meet nearly every one of the early milestones established by the NWPA.

19. In late 1993 and early 1994, DOE began to take actions both recognizing that it would not meet the January 31, 1998 deadline for acceptance of SNF, and tentatively asserting it may have no obligation to meet that deadline absent an operational repository or other facility.

20. In a joint letter to DOE, dated November 19, 1993, a number of utility, regulatory, and state officials requested that DOE address its responsibilities for accepting and disposing of SNF.

21. On May 25, 1994, DOE published a Notice of Inquiry ("NOI") to elicit views of affected parties on matters relating to the continued storage of SNF at reactor sites beyond 1998. *See* 59 *Fed. Reg.* 27,007 (1994). DOE noted in its NOI its "preliminary view" that it had no statutory obligation to accept SNF by the 1998 deadline in the absence of an operational repository or other facility constructed under the Act.

22. On April 28, 1995, DOE completed the NOI process by issuing its "Final Interpretation." The Final Interpretation proceeded from the premise that DOE would not be able to begin accepting SNF by the January 31, 1998 date established in the Act. *See* 60 *Fed. Reg.* 21,793 (1995). Instead, DOE announced "that it does not have a legal

obligation under . . . the Act . . . to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the [NWPA]." *Id.* at 21,794.

23. DOE's position was challenged by several utilities in a lawsuit brought before the United States Court of Appeals for the District of Columbia, which ruled that the NWPA imposed an unconditional obligation on DOE to begin accepting SNF on or before January 31, 1998. *See Indiana Michigan Power Co. v. U. S. Dept. of Energy*, 88 F.3d 1272 (D.C. Cir. 1996).

24. In response to the *Indiana Michigan* decision, on December 17, 1996, DOE issued a letter to Standard Contract holders stating: "Pursuant to Article IX of the Standard Contract, this letter is to advise you that DOE anticipates that it will be unable to begin acceptance of SNF for disposal in a repository or interim storage facility by January 31, 1998." DOE subsequently stated that "this delay was due to circumstances beyond the reasonable control of DOE and therefore the anticipated delay was unavoidable' within the meaning of Article IX of the Standard Contract."

25. On January 31, 1997, a number of utilities filed a petition with the D.C. Circuit for a Writ of Mandamus to compel DOE to comply with the mandate in *Indiana Michigan*.

26. On June 3, 1997, while the mandamus proceeding was pending, DOE issued a Preliminary Determination that DOE's delay in beginning SNF disposal was "unavoidable."

27. On November 14, 1997, the D.C. Circuit issued its decision in *Northern States Power Co. v. U. S. Dept. of Energy*, 128 F.3d 754 (D.C. Cir. 1997) in response to

the Writ of Mandamus filed by utilities, rejecting DOE's June 3, 1997 Preliminary Determination.

28. The Court in *Northern States Power* expressed dissatisfaction with DOE's response to the *Indiana Michigan* decision. The Court stated:

> After issuing our decision in *Indiana Michigan*, we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so. Quite the contrary. . . The contractual obligations created consistently with the statutory contemplation leave no room for DOE to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress...We held in *Indiana Michigan* that the NWPA imposes an unconditional duty on DOE. . . to assume an unqualified obligation to take the materials by the statutory deadline.

*Id.* at 757 - 760.

29. The Court refused to accept DOE's defense of unavoidability, finding the defense merely a recycled argument which had been previously rejected by the Court in *Indiana Michigan*.

30. The Court invalidated DOE's interpretation of the "unavoidable delays" clause because it would "absolve itself from bearing the costs of its delay if the delay is caused by the government's own acts." *Id.* at 760.

31. The Court, in applying the mandamus test, did not grant all of the relief requested by petitioners. While the Court found that there was a clear right to relief and a clear duty to act, it also found that the Standard Contract presents "another potentially adequate remedy." *Id.* at 759. The Court held that the petitioners must, in the first instance, pursue contract-based remedies.

32. January 31, 1998, came and went without DOE accepting any SNF from any Standard Contract holder, including CCNPP and NMPNS.

33. A number of Standard Contract holders have filed and pursued lawsuits against the DOE in this Court.

34. On August 31, 2000, the United States Court of Appeals for the Federal Circuit issued companion decisions in *Maine Yankee Atomic Power Co. v. U. S.*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. U. S.*, 224 F.3d 1361 (Fed. Cir. 2000), effectively holding that the DOE is liable for breach of the Standard Contract and that claims for damages should be pursued through lawsuits in the Court of Federal Claims. In these opinions, which resolved divergent holdings of two Court of Federal Claims judges and became final in December 2000, the Federal Circuit concluded that claims against DOE in these circumstances do not "arise under" the contracts, and may therefore be brought directly in court.

35. The rationale, articulated in the *Maine Yankee* decision, was that the DOE's across-the-board failure to begin taking fuel was not a "delay" as that term is used in the Standard Contract. Rather, the "delay" term of the Standard Contract contemplates the sort of routine delays one might expect to arise in connection with acceptance of fuel from individual utilities, *i.e.*, after programmatic performance by the DOE had commenced.

36. The Federal Circuit's *Northern States Power* decision adopted the rationale of the *Maine Yankee* decision on the jurisdictional issue, reversing the lower court. It also reiterated the unconditional obligation of the DOE as expressed by the D.C. Circuit, and accordingly affirmed the ruling in plaintiff's favor on liability for breach of contract.

37. DOE continues to refuse to provide a firm date for commencing the disposal of Plaintiffs' SNF.

**<u>Damages to Plaintiffs Caused by DOE's Partial Material Breach</u>**

38. Plaintiffs have complied with their obligations under the Standard Contracts but have not received DOE's promised performance. DOE's partial material breach of its statutory and contractual obligations has required Plaintiffs to take actions, at substantial cost, to maintain the SNF at Plaintiffs' reactor sites.

39. The damages incurred and to be incurred by Plaintiffs as a direct and proximate result of Defendant's breach include, but are not limited to, costs associated with materials, engineering, acquisition, planning, training, wages, health physics, surveillance monitoring and testing, security, environmental monitoring, insurance, overhead, licensing, transportation, regulatory oversight, maintenance, finance, taxes, and delayed decommissioning activities relating to SNF storage and management activities, including design, construction and operation of dry SNF storage at Independent Spent Fuel Storage Installations (ISFSIs), and loading and purchase of associated dry storage casks.

## CLAIMS FOR RELIEF

## COUNT I

**(Partial Material Breach of Express Written Contract)**

40. Plaintiffs repeat and re-allege paragraphs 1 through 39 above.

41. The Standard Contracts are valid and binding contracts between Plaintiffs and Defendant.

42. The Standard Contracts required Defendant to commence accepting SNF on or before January 31, 1998.

43. Plaintiffs have complied and continue to comply with all of their obligations under the Standard Contracts.

44. Defendant, which has an unconditional obligation to commence accepting SNF by January 31, 1998, has not accepted any SNF from Plaintiffs.

45. Defendant's failure to perform the services contemplated by the Standard Contracts on or before January 31, 1998 constitutes a partial material breach of the Standard Contracts by Defendant.

46. Plaintiffs have incurred and will continue to incur significant damages as a direct and proximate result of Defendant's partial material breach of the Standard Contracts.

47. As a direct and proximate result of Defendant's partial material breach, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT II

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

48. Plaintiffs repeat and re-allege paragraphs 1 through 47 above.

49. The Standard Contracts between Plaintiffs and Defendant contain an implied covenant of good faith and fair dealing, pursuant to which Defendant has a duty to perform its obligations under the Contract in good faith and not to take actions detrimental to Plaintiffs' contractual rights. Defendant has breached the covenant of good faith and fair dealing by failing and refusing to take reasonable steps to meet the contractual deadline for beginning to dispose of SNF; by consistently attempting to avoid its obligations under the Contracts as defined by the D.C. Circuit; and by failing to take steps that it could have taken to dispose of Plaintiffs' SNF or even to provide Plaintiffs with a firm date on which Defendant will begin to do so.

50. Defendant's failure to act has not been the result of technical inability, legal impediment, or inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to Defendant to comply with its contractual obligations.

51. In contrast to Defendant's failure to take any action to meet its contractual commitments to Plaintiffs, Defendant has taken action to receive, transport and store SNF from other entities. For example, Defendant has accepted and stored SNF from domestic and foreign research reactors.

52. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer damages as alleged above.

## COUNT III

### (Taking Without Just Compensation of Real Property)

53. Plaintiffs repeat and re-allege paragraphs 1 through 52 above.

54. The Government was and is unequivocally obligated to commence acceptance and disposal of plaintiffs' SNF.

55. The Government's failure to honor its commitments was, and continues to be, unnecessary and extraordinary.

56. The Government's failure and refusal to comply with its obligations for acceptance and disposal of plaintiffs' SNF has deprived, and will continue to deprive, plaintiffs of the full value and economic use of the real property on which the SNF is stored at Calvert Cliffs and NMP.

57. By reason of the foregoing, Defendant's failure to dispose of plaintiffs' SNF amounts to a Fifth Amendment taking of Plaintiffs' real property on which Calvert Cliffs and NMP are located, without just compensation. Plaintiffs are entitled to just compensation for this taking in an amount to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant, the United States, in an amount to be determined in further proceedings, together with such additional costs, fees, and other relief as the Court may deem just and appropriate.

January 22, 2004

Respectfully submitted,

Brad Fagg (Counsel of Record)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania, N.W.
Washington, DC 20004
(202) 739-5191 Telephone
(202) 739-3001 Facsimile

Of Counsel:
Paul M. Bessette
MORGAN, LEWIS & BOCKIUS LLP

Attorneys for Plaintiffs
Constellation Generation Group, LLC,
Calvert Cliffs Nuclear Power Plant, Inc., and
Nine Mile Point Nuclear Station, LLC